```
                                        F I L E D
                                 CLERK, U.S. DISTRICT COURT

                                      1/17/2023

                                 CENTRAL DISTRICT OF CALIFORNIA
                                 BY: _____ VAV _____ DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2022 Grand Jury       **WAWD- MJ24-5174**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 2:23-cr-00019-DSF |
| Plaintiff, | I N D I C T M E N T |
| v. | [15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5: Securities Fraud; 18 U.S.C. § 1343: Wire Fraud; 15 U.S.C. § 80b-6, 80b-17: Investment Adviser Fraud; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 18 U.S.C. §§ 981(a)(1)(C), 982, and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| JAMES ARTHUR MCDONALD, JR., | |
| Defendant. | |

The Grand Jury charges:

COUNT ONE

[15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

a.   Defendant JAMES ARTHUR MCDONALD, JR., was a resident of Arcadia, California.

b.   Defendant MCDONALD was the Chief Executive Officer ("CEO") and Chief Investment Officer ("CIO") of Hercules Investments

LLC ("Hercules"), a California limited liability company headquartered in Los Angeles. From on or about September 5, 2019, to on or about December 31, 2021, Hercules was registered with the United States Securities and Exchange Commission ("SEC") as an investment adviser under the Investment Advisers Act of 1940, and defendant MCDONALD served as the investment adviser representative for Hercules.

c. Defendant MCDONALD was the CEO and CIO of Index Strategy Advisors Inc. ("ISA"), a Texas corporation headquartered in Los Angeles, California. From on or about November 22, 2010, to on or about May 1, 2019, ISA was registered in at least one state as an investment adviser under the Investment Advisers Act of 1940, and defendant MCDONALD served as the investment adviser representative for ISA.

i. On or about December 11, 2014, defendant MCDONALD filed on behalf of ISA a notice of withdrawal from registration as an investment adviser in all states in which ISA was registered except Texas.

ii. On or about May 1, 2019, defendant MCDONALD filed on behalf of ISA a notice of withdrawal from registration as an investment adviser in Texas, at which point ISA was no longer a registered investment adviser in any jurisdiction. In the withdrawal notice form, defendant MCDONALD represented, under penalty of perjury, that ISA had ceased conducting advisory business in the jurisdiction from which it was withdrawing as of August 1, 2018. In the "Reasons for withdrawal" section of the form, defendant MCDONALD crossed out "[c]ontinuing advisory activities, but relying on an exemption from registration," and wrote, "No longer in business or

closing business." Defendant MCDONALD also represented on the form that neither he, nor any related person, had custody of client assets.

        d. Bank of America, N.A., was a financial institution within the meaning of 18 U.S.C. § 1956(c)(6) whose accounts were then insured by the Federal Deposit Insurance Corporation.

        i. Defendant MCDONALD maintained a checking account at Bank of America ending -5386 in the name "Hercules Investments LLC" for which he was the sole signatory (the "Hercules BoA Account").

        ii. Defendant MCDONALD maintained a checking account at Bank of America ending -0758 in the name "Index Strategy Advisors Inc" for which he was the sole signatory (the "ISA BoA Account").

        e. Defendant MCDONALD was, with respect to ISA's clients, an investment adviser within the meaning of 15 U.S.C. § 80b-2(a)(11).

        f. Defendant MCDONALD rented a home in Arcadia, California, from landlord Y.C.

B.   <u>THE SCHEME TO DEFRAUD</u>

    2. Beginning no later than in or about January 2021, and continuing through on or about January 17, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant MCDONALD, knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and the mails, in connection with the purchase and sale of Hercules securities, used and employed manipulative and deceptive devices and contrivances by: (1) employing a scheme to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the

1  circumstances under which they were made, not misleading; and

2  (3) engaging in acts, practices, and courses of business which

3  operated and would operate as a fraud and deceit upon purchasers and

4  prospective purchasers of securities (the "victim-investors"), by

5  causing materially false and fraudulent statements and material

6  omissions to be made to the victim-investors about defendant

7  MCDONALD's use of victim-investors' investments and Hercules's

8  financial health.

9      3.   The scheme to defraud operated, in substance, as follows:

10         a.   Defendant MCDONALD solicited investments from the

11 victim-investors by offering to sell, as part of a purported "capital

12 raise," equity in Hercules in the form of "units," which units

13 constituted "securities" within the meaning of the Securities

14 Exchange Act of 1934.

15         b.   Defendant MCDONALD pitched investment opportunities to

16 the victim-investors, including by means of interstate wire

17 communications through use of Zoom's video teleconference platform.

18         c.   To induce the victim-investors to invest in Hercules

19 by purchasing units, defendant MCDONALD concealed from victim-

20 investors the following material facts:

21             i.   That, because of a risky bet that defendant

22 MCDONALD made using Hercules's clients' funds, Hercules's clients had

23 recently lost between $30 million and $40 million; and

24             ii.  That defendant MCDONALD had agreed on behalf of

25 Hercules to repay Hercules's clients, including, if necessary, with

26 funds obtained by selling equity in Hercules to the victim-investors.

27         d.   In soliciting funds from the victim-investors,

28 defendant MCDONALD falsely represented that the sale of equity in

4

Hercules was intended to finance the expansion of Hercules's infrastructure and staff.  In truth, as defendant MCDONALD then knew, defendant MCDONALD intended to use the victim-investors' funds to repay Hercules's clients and fund his own lifestyle.

e.  During investment pitches, defendant MCDONALD conveyed a false sense of urgency to the victim-investors by suggesting that, if victim-investors waited, they would lose the opportunity to invest because further equity in Hercules would no longer be available for sale.

f.  In soliciting investments from the victim-investors, defendant MCDONALD also misrepresented his educational background.

g.  Defendant MCDONALD caused victim-investors to make their purchases of units in Hercules by means of interstate wire transfers to the Hercules BoA Account.

h.  To lull victim-investors who confronted him about the use of their investments, and delay their bringing legal action against him, defendant MCDONALD falsely promised to repay their investments and issued purported promissory notes.

i.  To prevent exposure of his misuse of victim-investors' funds, defendant MCDONALD failed to appear, as required, to testify before the SEC, changed his residence, and concealed his location from government authorities.

C.  EXECUTION OF THE FRAUDULENT SCHEME

4.  On or about March 9, 2021, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, and in furtherance of the manipulative and deceptive devices described above, defendant MCDONALD directly and indirectly caused the use of a means and instrumentality of

interstate commerce in connection with the purchase and sale of securities, namely, the interstate wire transfer of approximately $675,000 from a bank account belonging to victim-investor T.I. to the Hercules BoA Account in connection with the purchase of Hercules units.

COUNT TWO

[18 U.S.C. § 1343]

5.   The Grand Jury realleges paragraphs 1, 3, and 4 of this Indictment here.

A.   THE SCHEME TO DEFRAUD

6.   Beginning no later than in or about January 2021, and continuing through on or about January 17, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant MCDONALD, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud victim-investors in Hercules as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, promises, and the concealment of material facts.

7.   The scheme to defraud operated, in substance, as described in paragraph 3 of this Indictment.

B.   USE OF INTERSTATE WIRES

8.   On or about March 11, 2021, in Los Angeles County, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, defendant MCDONALD transmitted and caused the transmission of a wire communication in interstate commerce, namely, a Zoom video meeting with victim-investors R.F. and K.F.

                        COUNTS THREE THROUGH FIVE

                         [15 U.S.C. §§ 80b-6, 80b-17]

    9.   The Grand Jury realleges paragraph 1 of this Indictment
here.

A.   THE SCHEME TO DEFRAUD

    10.   Beginning no later than on or about May 1, 2019, and
continuing through on or about January 17, 2023, in Los Angeles
County, within the Central District of California, and elsewhere,
defendant MCDONALD, knowingly and willfully, directly and indirectly,
by the use of the means and instrumentalities of interstate commerce
and the mails, (a) employed devices, schemes, and artifices to
defraud ISA's clients and prospective clients; and (b) engaged in
transactions, practices, and courses of business which operated as a
fraud and deceit upon ISA's clients and prospective clients.

    11.   The scheme to defraud operated, in substance, as follows:

         a.   Defendant MCDONALD solicited prospective clients to
provide funds for ISA to manage on their behalf through further
investment of those funds.

         b.   In soliciting prospective clients, defendant MCDONALD
falsely represented that ISA was a registered investment adviser even
after defendant MCDONALD had terminated ISA's status as a registered
investment adviser in all jurisdictions, stated that ISA was "[n]o
longer in business or closing business," and represented that neither
he, nor any related person, had custody of ISA's client assets.

         c.   Defendant MCDONALD falsely represented to ISA's
clients that he would use their funds to trade securities.  In fact,

              i.   Defendant MCDONALD used less than half of the
money he raised from ISA's clients for the purpose of trading

                                   8

securities and sometimes conducted no trading activity at all with ISA's client funds for months at a time; and

ii. Defendant MCDONALD misappropriated ISA's client funds by using them to pay his personal expenses, pay Hercules's clients and/or creditors, and pay Ponzi-like returns to investors to create the false impression that ISA was a successful firm.

d. Defendant MCDONALD falsely represented to ISA's clients that their funds would be held in individual accounts. Instead, defendant MCDONALD commingled ISA's client funds with Hercules's client funds and personal funds.

e. To conceal his misappropriation of ISA's client funds and continue his fraudulent scheme, defendant MCDONALD sent ISA's clients false account statements each month that purported to show positive returns from trading and cash held at the end of the month.

f. To prevent exposure of his misuse of ISA's clients' funds, defendant MCDONALD failed to appear, as required, to testify before the SEC, changed his residence, and concealed his location from government authorities.

B. EXECUTIONS OF THE FRAUDULENT SCHEME

12. On or about the following dates, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, defendant MCDONALD directly and indirectly caused the use of a means and instrumentality of interstate commerce in connection with the purchase and sale of

//

//

securities, namely, the transmission of the following items by means of interstate wire communication:

| COUNT | DATE | EXECUTION |
|-------|------|-----------|
| THREE | 05/29/2020 | Interstate wire transfer of $150,000 from ISA client J.M. to the ISA BoA Account |
| FOUR | 12/29/2020 | Interstate wire transfer of $100,000 from ISA client C.M. to the ISA BoA Account |
| FIVE | 01/05/2021 | Interstate wire transfer of $3,000 from the ISA BoA Account to the bank account of ISA client B.C. |

COUNTS SIX AND SEVEN

[18 U.S.C. § 1957]

13.  The Grand Jury realleges paragraphs 1 and 3 through 5 of this Indictment here.

14.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant MCDONALD, knowing that the property involved represented the proceeds of some form of unlawful activity, knowingly engaged in the following monetary transactions in criminally derived property of a value greater than $10,000, which property, in fact, was derived from specified unlawful activity, namely, securities fraud, in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, as charged in Count One of this Indictment:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| SIX | 03/10/2021 | Wire transfer of approximately $174,610 from the Hercules BoA Account to Kienle Motor Sports LLC, dba Porsche Ontario |
| SEVEN | 03/10/2021 | Wire transfer of approximately $109,512 to C.H. on behalf of landlord Y.C. |

11

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c)]

15.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant JAMES ARTHUR MCDONALD, JR.'s conviction of any of the offenses set forth in Counts One through Five of this Indictment.

16.   Defendant MCDONALD, if so convicted, shall forfeit to the United States of America the following:

a.   All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

17.   Pursuant to Title 18, United States Code, Section 981(a)(1)(c), as incorporated by Title 28, United States Code, Section 2461(c), if so convicted, defendant MCDONALD shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of defendant MCDONALD, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in

12

1  value; or (e) has been commingled with other property that cannot be
2  divided without difficulty.

1          FORFEITURE ALLEGATION TWO

2              [18 U.S.C. § 982]

3       18.  Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States will seek

5  forfeiture as part of any sentence, pursuant to Title 18, United

6  States Code, Section 982(a)(1) and Title 28, United States Code,

7  Section 2461(c), in the event of defendant JAMES ARTHUR MCDONALD,

8  JR.'s conviction of either of the offenses set forth in Counts Six

9  and Seven of this Indictment.

10      19.  Defendant MCDONALD, if so convicted, shall forfeit to the

11 United States of America the following:

12          a.   Any property, real or personal, involved in such

13 offense, and any property traceable to such property; and

14          b.   To the extent such property is not available for

15 forfeiture, a sum of money equal to the total value of the property

16 described in subparagraph (a).

17      20.  Pursuant to Title 21, United States Code, Section 853(p),

18 as incorporated by Title 18, United States Code, Section 982(b)(1),

19 and Title 18, United States Code, Section 982(b)(2), defendant

20 MCDONALD, if so convicted, shall forfeit substitute property, if, by

21 any act or omission of defendant MCDONALD, the property described in

22 the preceding paragraph, or any portion thereof: (a) cannot be

23 located upon the exercise of due diligence; (b) has been transferred,

24 sold to, or deposited with a third party; (c) has been placed beyond

25 the jurisdiction of the court; (d) has been substantially diminished

26 in value; or (e) has been commingled with other property that cannot

27 be divided without difficulty.  Substitution of assets shall not be

28 ordered, however, where the convicted defendant acted merely as an

14

intermediary who handled but did not retain the property in the
course of the money laundering offense unless the defendant, in
committing the offense or offenses giving rise to the forfeiture,
conducted three or more separate transactions involving a total of
$100,000.00 or more in any twelve-month period.


                                    A TRUE BILL


                                    _____/S/_____
                                    Foreperson


E. MARTIN ESTRADA
United States Attorney



SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

CAROLYN S. SMALL
ALEXANDER B. SCHWAB
Assistant United States Attorneys
Major Frauds Section

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>PLAINTIFF,<br><br>v.<br><br>JAMES ARTHUR MCDONALD, JR.,<br><br>DEFENDANT | CASE NUMBER:<br><br>1 |
| | **WARRANT FOR ARREST** |

To:    UNITED STATES MARSHAL AND ANY AUTHORIZED UNITED STATES OFFICER

**YOU ARE HEREBY COMMANDED** to arrest **JAMES ARTHUR MCDONALD, JR.**, and bring him forthwith to the nearest Magistrate Judge to answer an Indictment charging him with securities fraud, wire fraud, investment adviser fraud, and transactional money laundering, in violation of Title 15, United States Code, Sections 78j(b), 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 1343; Title 15, United States Code, Sections 80b-6, 80b-17; and Title 18, United States Code, Section 1957.

Kiry K. Gray
NAME OF ISSUING OFFICER

Clerk of Court
TITLE OF ISSUING OFFICER

SIGNATURE OF DEPUTY CLERK

January 17, 2023          Los Angeles, CA

DATE AND LOCATION OF ISSUANCE

By:   JEAN P. ROSENBLUTH
NAME OF JUDICIAL OFFICER

**RETURN**

THIS WARRANT WAS RECEIVED AND EXECUTED WITH THE ARREST OF THE ABOVE-NAMED DEFENDANT AT (LOCATION)

DATE RECEIVED

NAME OF ARRESTING OFFICER

DATE OF ARREST

TITLE

**DESCRIPTIVE INFORMATION FOR DEFENDANT CONTAINED ON PAGE TWO**

SIGNATURE OF ARRESTING OFFICER

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>PLAINTIFF,<br><br>v.<br><br>JAMES ARTHUR MCDONALD, JR.,<br><br>DEFENDANT | CASE NUMBER:<br><br>1 |
|---|---|
| | **WARRANT FOR ARREST** |

## ADDITIONAL DEFENDANT INFORMATION

| RACE: | SEX: | HEIGHT: | WEIGHT: | HAIR: | EYES: | OTHER: | |
|---|---|---|---|---|---|---|---|

| DATE OF BIRTH:<br>**1971** | PLACE OF BIRTH: | SOCIAL SECURITY NO.: | DRIVER'S LICENSE NO. | ISSUING STATE |
|---|---|---|---|---|

| ALIASES: | SCARS, TATTOOS OR OTHER DISTINGUISHING MARKS: |
|---|---|

| AUTO YEAR: | AUTO MAKE: | AUTO MODEL: | AUTO COLOR: | AUTO LICENSE NO.: | ISSUING<br><br>STATE |
|---|---|---|---|---|---|

| LAST KNOWN RESIDENCE: | LAST KNOWN EMPLOYMENT: |
|---|---|

| FBI NUMBER: |
|---|

| ADDITIONAL INFORMATION: |
|---|

| INVESTIGATIVE AGENCY NAME:<br>**FBI, IRS-CI** | INVESTIGATIVE AGENCY ADDRESS: |
|---|---|

NOTES:

AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

9/21/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ____ of ____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

9/21/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ____ ib ____ DEPUTY

|  |  |
|---|---|
| United States of America | |
| v. | Case No.   2:22-mj-03751-DUTY |
| James Arthur McDonald, Jr., | |
| Defendant | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 9, 2021, in the county of Los Angeles in the Central District of California, the

defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5 | Securities Fraud |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s Robert Chowthi*
*Complainant's signature*

ROBERT CHOWTHI, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     9/21/2022

*Judge's signature*

City and state:   Los Angeles, California

HON. ALEXANDER F. MACKINNON
U.S. Magistrate Judge
*Printed name and title*

AUSA: Carolyn S. Small (x2041) / Alexander B. Schwab (x1259)

## AFFIDAVIT

I, Robert Chowthi, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1.      This affidavit is made in support of a criminal complaint and arrest warrant for JAMES ARTHUR MCDONALD, JR. ("MCDONALD") for a violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 (Securities Fraud).[1]

2.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

---

[1] Ninth Circuit Model Criminal Jury Instruction Number 15.47 states that for a defendant to be found guilty of securities fraud under 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5, the government must prove each of the following elements beyond a reasonable doubt:

(1)     The defendant willfully used a device or scheme to defraud someone, made an untrue statement of a material fact, failed to disclose a material fact that resulted in making the defendant's statement misleading, or engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person;

(2)     The defendant's acts were undertaken, the statement was made, or the failure to disclose was done in connection with the purchase or sale of a security;

(3)     The defendant directly or indirectly used the security in connection with these acts, making this statement, or this failure to disclose; and

(4)     The defendant acted knowingly.

The model instruction specifies that "willfully" means intentionally undertaking an act, making an untrue statement, or failing to disclose for the wrongful purpose of defrauding or deceiving someone. Acting willfully does not require that the defendant know that the conduct was unlawful.

## BACKGROUND OF FBI SPECIAL AGENT ROBERT CHOWTHI

3.      I am a Special Agent with the FBI and have been so employed since March 2017.
I am currently assigned to the Long Beach Resident Agency to investigate white collar crime.
Prior to being employed by the FBI as a Special Agent, I was employed by Bank of America as
a Global Financial Crimes Auditor for five years, where my responsibilities included ensuring
that processes and controls were in place to prevent fraud and money laundering.

4.      Since graduating from the FBI Academy, where I received formal training, I have
participated in investigations relating to violent crimes, robberies, kidnappings, wire fraud,
embezzlements, romance scams, investment fraud, and various types of financial institution
fraud. My involvement in these investigations has included reviewing evidence, analyzing
financial documents, conducting physical and electronic surveillance, working with informants,
and executing search and arrest warrants. Additionally, I have interviewed victims who have
had personal knowledge regarding the investigation in which I have been involved.

## SUMMARY OF PROBABLE CAUSE

5.      MCDONALD, previously a frequent guest analyst on CNBC, was CEO and chief
investment officer of two investment companies: Hercules Investments LLC ("HERCULES"), a
California limited liability company headquartered in Los Angeles, and Index Strategy Advisors
Inc. ("ISA"), a Texas corporation headquartered in Los Angeles.

a.      MCDONALD lost tens of millions of dollars of HERCULES investor
funds after adopting a risky short position that effectively bet against the health of the U.S.
economy in the wake of the 2020 presidential election. In early 2021, he then solicited further
funds from investors in the form of a purported capital raise for HERCULES. In doing so, he
misrepresented how the funds would be used and failed to disclose the massive losses
HERCULES had previously sustained. For example, in connection with the HERCULES capital
raise, he obtained $675,000 in investment funds from one victim group on March 9, 2021. He
then misappropriated those funds in various ways, including spending roughly $174,610 of them
at a Porsche dealership.

b.      My investigation has revealed that MCDONALD's fraudulent capital raise is part of a broader pattern of deceptive conduct, which includes the creation of false account statements for ISA clients, his ongoing misrepresentation to clients that ISA was a registered investment adviser even after he had terminated its registration, and even misleading statements about his educational background.

c.      MCDONALD was subpoenaed to testify before the U.S. Securities and Exchange Commission ("SEC") in the fall of 2021 but, without advance notice, failed to appear as required. Based on my review of measures MCDONALD has taken since then, I believe he has consciously gone into hiding.

d.      For these reasons, and as set forth in further detail below, I therefore submit that there is probable cause that MCDONALD committed Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.

## STATEMENT OF PROBABLE CAUSE

6.      Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.      Background on MCDONALD, ISA, and HERCULES**

1.      <u>MCDONALD</u>

7.      I know from publicly available documents that under the Investment Advisers Act of 1940, firms or sole practitioners that are compensated for advising others about securities investments must register with the SEC or with the state in which the investment adviser maintains its principal place of business and conform to regulations designed to protect investors.

8.      From approximately September 5, 2019 until December 31, 2021, MCDONALD was an investment-adviser representative of HERCULES, an SEC-registered investment adviser. From approximately November 22, 2010 until May 1, 2019, MCDONALD was an investment-adviser representative of ISA, a state-registered investment adviser.

9.      According to one website,[2] MCDONALD is a 25-year veteran of the investment industry, was a frequent lecturer and conference speaker, and was named one of America's top 10 investment advisers by ETF.com in 2012. Prior to founding HERCULES and ISA, he was director of strategy for a wealth management group at BBVA Compass. MCDONALD was also a paid contributor on CNBC and appeared on CNBC programs several times in late 2020 and in 2021, commenting on topics ranging from stock recommendations based on businesses likely to see growth during and after the COVID-19 pandemic[3] to the "disconnect between Main Street and Wall Street" in terms of market exuberance despite the pandemic's lingering challenges.[4]

10.     MCDONALD has long expressed an affinity for the game of football, mentioning to investors that he played semi-professionally for years. *See* Greg Bartalos, "A Player-Turned-RIA on 2021's Super Bowl and the Market Roller Coaster Ahead," *RIA Intel* (Feb. 5, 2021) ("In 2005 he purchased the Houston Wolverines (the Texas Wolverines today), a semi-pro football team, and played for 13 years.").[5]

11.     MCDONALD also regularly described his educational background to investors, frequently in a way that was misleading. Many of MCDONALD's promotional materials reference his bachelor's degree in economics from Harvard University. A glowing *Forbes* article describes him as the coauthor of a book titled *How to Invest in Bitcoin By Two Harvard Minds* and declares that he is "a graduate of Harvard University with a B.A. in Economics." John Navin, "Dow 15,000 May Be The Target? Money Manager James McDonald Says Yes,"

---

[2] Available at https://eqderivatives.com/speakers/james-mcdonald.

[3] *See* https://www.cnbc.com/video/2020/09/08/short-term-futures-on-volatility-important-hercules-investments-james-mcdonald.html.

[4] *See* https://www.cnbc.com/video/2021/03/18/hercules-james-mcdonald-theres-a-disconnect-between-main-street-and-wall-street.html. It appears, from the March 18, 2021 date listed for this video, that it occurred just over one week after MCDONALD had misappropriated $675,000 in investor funds intended for the HERCULES capital raise. *See* paragraphs 39-41, below.

[5] Available at https://www.riaintel.com/article/b1qfjbrsnjyd9c/a-player-turned-ria-on-2021s-super-bowl-and-the-market-roller-coaster-ahead.

*Forbes* (Nov. 1, 2020).[6] In fact, educational records from Harvard University reveal that MCDONALD is a graduate of the Harvard Extension School, which does not offer B.A. degrees in economics, as Harvard College does.

12.     The Harvard Extension School is not a traditional college whose admissions are based on the typical academic markers, but rather "an open-enrollment institution" whose degree programs are open to all who perform sufficiently well "in up to three requisite Harvard Extension degree courses."[7] The Harvard Extension School offers two degrees: a "Bachelor of Liberal Arts in Extension Studies" and a "Master of Liberal Arts in Extension Studies." According to the Harvard Extension School website, the degree may be listed in one of two ways:[8]

Bachelor [or Master] of Liberal Arts, Harvard University Extension School.

- Include field of study, minor, and degree honors when applicable.

or

Bachelor [or Master] of Liberal Arts, Extension Studies, Harvard University.

- Include field of study, minor, and degree honors when applicable.

13.     Neither of these acceptable listings is consistent with MCDONALD's practice in representing his educational background. In fact, even his claim to have received a degree in economics is false; MCDONALD's transcripts from the Harvard Extension School list his

---

[6] Available at https://www.forbes.com/sites/johnnavin/2020/11/01/dow-15000-is-the-target-money-manager-james-macdonald-says-yes/?sh=2ef067a329f2.

[7] https://extension.harvard.edu/registration-admissions/degree-program-admissions/. Other eligibility requirements exist, such as not already holding a bachelor's degree and not being enrolled in another degree program simultaneous with the Extension School. *See* https://extension.harvard.edu/registration-admissions/degree-program-admissions/undergraduate-admissions/.

[8] https://extension.harvard.edu/for-students/degree-candidate-academic-opportunities/participate-in-commencement/#:~:text=When%20you%20are%20in%20MyDCE,%E2%80%9CCommonly%20Used%20Forms%E2%80%9D%20tab.

concentration as "Social Sciences," and only one of the sixteen classes he took—
"Macroeconomics as Problem/Hist"—appears to be an economics class.

14.     Similarly, running a Google search for "JAMES MCDONALD Harvard" yields,
as the top hit, a webpage that appears at first glance to be Harvard-affiliated—
https://harvard.academia.edu/JamesMcDonald—and displays the following academic bona
fides:



In reality, this webpage is hosted by "Academia.Edu," which, according to its own website and
other public sources, is a for-profit, open-access platform where registered users can create a
webpage and post articles free to read by visitors.[9]

2.     ISA

15.     The SEC's Investment Adviser Public Disclosure website shows that from
November 22, 2010, to May 1, 2019, MCDONALD was an investment-adviser representative
with ISA, which was a state-registered investment adviser.

16.     ISA was previously registered as an investment adviser in Arizona, California,
Florida, Georgia, Ohio, Texas, and Virginia. On December 11, 2014, MCDONALD filed on
behalf of ISA a notice of withdrawal from registration as an investment adviser in Arizona,
California, Florida, Georgia, Ohio, and Virginia, leaving Texas as the only state in which ISA
was registered. MCDONALD stated in the notice of withdrawal that ISA would be continuing its
advisory activities but was relying on an exemption from registration.

---

[9] *See* https://www.academia.edu/about.

17.     On May 1, 2019, MCDONALD filed on behalf of ISA a notice of withdrawal from registration as an investment adviser in Texas, meaning ISA was no longer registered as an investment adviser in any jurisdiction as of that date. In the withdrawal notice form, MCDONALD listed himself as a contact employee for the business who was authorized to receive information and respond to questions about the withdrawal notice, and he updated his contact information from an address in Houston, Texas, to an address in Redondo Beach, California. MCDONALD represented that ISA had ceased conducting advisory business in the jurisdiction from which it was withdrawing as of August 1, 2018. In the "Reasons for withdrawal" section of the form, MCDONALD crossed out "[c]ontinuing advisory activities, but relying on an exemption from registration," and wrote, "No longer in business or closing business." MCDONALD also represented on the form that neither he, nor any related person, had custody of client assets. MCDONALD signed the form under penalty of perjury under the laws of the United States. As explained in further detail below, his representations were false.

3.     HERCULES

18.     From September 5, 2019, to December 31, 2021, MCDONALD was an investment-adviser representative with HERCULES.

19.     The Investment Adviser Public Disclosure website shows that HERCULES was registered as an investment-adviser in California until April 11, 2021 and was registered with the SEC effective December 1, 2020. Documents from the SEC show that on or about March 12, 2021, MCDONALD filed a notice withdrawing HERCULES from registration in California. In the notice of withdrawal, MCDONALD stated that HERCULES had not ceased conducting advisory business in California and the reason for withdrawal was to switch from state registration to SEC registration.

20.     A form filed on the Investment Adviser Public Disclosure website in June 2021 states that HERCULES' principal office and place of business is Los Angeles, California. SEC filings and California Secretary of State records list MCDONALD as HERCULES' CEO.

21.     When HERCULES' website was active, it described HERCULES as a "World Class portfolio manager for growth-seeking individual investors." MCDONALD was listed as the CEO and Chief Investment Officer and was described as a "25 year veteran of the investment industry" who "was named one of America's top 10 investment advisors by ETF.com in 2012." The HERCULES website now appears to have been taken down.

22.     When active, HERCULES' website further stated when a client invested with HERCULES, HERCULES managed the investments, but Interactive Brokers, LLC held the assets. According to information provided by Interactive Brokers, Interactive Brokers is an exclusively online broker that provides trade execution and clearing services to public clients around the world. It does not employ any human advisers or brokers who manage client accounts; rather, clients enter trades on a personal computer, and the trades are then transmitted to Interactive Brokers for execution on various exchanges and market centers. All trading in Interactive Brokers' client accounts is self-directed by the client or by an independent adviser selected by the client, like MCDONALD.

**B.      HERCULES' Clients Suffer Extensive Losses After MCDONALD Makes a Risky Investment**

23.     I know from reviewing records from HERCULES, HERCULES clients, and former HERCULES employees, and from public statements made by MCDONALD, that in early fall or winter 2020, MCDONALD made a risky investment with HERCULES clients' funds based on MCDONALD's projection that the COVID-19 pandemic and the 2020 presidential election would result in big selloffs that would cause the stock market to drop. But the market did not drop as MCDONALD had hoped. I know from speaking with a representative from Interactive Brokers and reviewing HERCULES' records that as a result of MCDONALD's inaccurate prediction, HERCULES' clients lost an aggregate of approximately $30 to $40 million.

24.     According to HERCULES' public filings, MCDONALD's compensation for his investment advisory services was based on a percentage of assets under his management,

performance-based fees, and hourly charges. Specifically, there was an annual fee equal to 2% of total assets under HERCULES' management, and certain investors were charged a performance fee of 20% on net profits in addition to the annual fee. HERCULES also charged an hourly fee between $200 and $300 for financial-planning services. Because MCDONALD's compensation was tied heavily to the performance of his clients' investments, the losses to HERCULES' clients in late 2020 would have significantly decreased the fees MCDONALD was entitled to collect as well as HERCULES' revenue.

25.     HERCULES' records and records produced by witnesses show that in late 2020, MCDONALD was planning to launch a publicly traded mutual fund under the ticker symbol "NFLHX."[10] The losses to HERCULES' clients and the potential for litigation related to those losses also jeopardized the success of that fund because any litigation would have had to be publicly disclosed.

26.     Emails and other records produced by former HERCULES clients and by HERCULES show that at least by about December 2020, HERCULES clients were complaining to HERCULES' employees about the losses in their accounts.

27.     To address these clients' concerns, MCDONALD began sending out daily email updates and holding weekly Zoom webinars about his plan for making up the losses and recovering his clients' money. Emails MCDONALD sent to HERCULES clients show that MCDONALD's plan was to first attempt to make up the losses in his clients' accounts through trading. If that failed, his backup plan was to sell equity in HERCULES and use the funds from the equity sale and from investments in his newly created fund, NFLHX, to repay the aggrieved clients.

     a.     For example, in one email to clients V.G. and E.G. on or about January 23, 2021, MCDONALD sent a link to a website announcing the launch of NFLHX and stated the

---

[10] My understanding, based on my review of records and in speaking with witnesses, is that MCDONALD selected the "NFLHX" ticker name to pay homage to his dream of one day owning a National Football League franchise.

fund was "the source of funds" to pay V.G. and E.G. back if MCDONALD was unable to make up the losses through market trades.

b.     Additionally, in a daily email update that MCDONALD sent to HERCULES clients on approximately February 25, 2021, MCDONALD included a section titled "Contingency Plan Update." In that section, MCDONALD explained that he and three other HERCULES employees would be flying to Minneapolis because "a major investment firm will be making a significant investment in NFLHX and Hercules." MCDONALD stated, "We are excited about strengthening our business and economic resources to ensure we can meet the obligation of restoring your account directly in the event this trade thesis fails."

28.     In or around January 2021, MCDONALD also started entering into contracts with affected HERCULES clients titled "Amendment to Performance Fee Investment Advisory Contract." In those contracts, MCDONALD agreed that HERCULES would waive its right to receive any performance fees until the client's account balance was restored to pre-trade-loss levels. MCDONALD further agreed that in the event the client's account balance was not restored by the close of business on June 30, 2021, HERCULES would make monthly payments to make up the difference in account value. When MCDONALD entered into these contract amendments, he also entered into corresponding "Personal Guarantee Agreements" in which he personally guaranteed the client would be repaid.

29.     According to a written narrative from HERCULES' Vice President of Business Development, B.S., which I have reviewed, MCDONALD was very convincing and persuaded the clients to keep hoping for a good outcome. Eventually, however, it seemed to B.S. that MCDONALD was just stalling for time. B.S. also said that MCDONALD warned clients and the HERCULES team that if MCDONALD was sued in any more lawsuits or named in any more complaints, the hope of anyone getting any money back would be lost.

    **C.**    **MCDONALD Solicits New Investors in HERCULES and Doesn't Disclose the Recent Losses to HERCULES' Clients or His Loss Recovery Plan and Promises to Repay**

30.    According to victim K.F., on Christmas Day in 2020, MCDONALD contacted K.F. to see if K.F. would go into business with MCDONALD and help MCDONALD promote his new fund, NFLHX. MCDONALD invited K.F. to sit in on investment-pitch presentations MCDONALD was giving to prospective investors in which MCDONALD was offering to sell an equity stake in HERCULES. K.F. was impressed by the presentations, and he asked MCDONALD to give K.F.'s family members and close friends the opportunity to participate in this "capital raise" and invest in HERCULES.

31.    I know from reviewing a Zoom recording provided by a witness that on or about February 27, 2021, MCDONALD gave his capital raise investment pitch to K.F.'s family members and close friends using Zoom's virtual meeting platform. MCDONALD held a follow-up Zoom meeting on or about March 3, 2021, to answer the prospective investors' questions. This meeting was also recorded, and I have reviewed a copy of the recording. At no point during either Zoom meeting did MCDONALD disclose that HERCULES' clients had recently suffered aggregate losses of approximately $30 to $40 million; that he had been agreeing to waive investment-adviser performance fees until the losses were made up; that he had been obligating HERCULES to repay the losses; or that this "capital raise" was part of MCDONALD's contingency plan for repaying the losses suffered by existing HERCULES' clients. Rather, one of the PowerPoint slides falsely stated that HERCULES was selling equity "to finance the expansion of the firm's infrastructure and necessary sales staff to capture the growing demand of interest in NFLHX."

32.    MCDONALD also represented during the February 27, 2021, Zoom meeting that HERCULES would not need capital to operate but wanted capital to grow. In reality, by that point, HERCULES' financial condition was so dire that at least one now-former HERCULES employee told me she was not receiving her salary during that time.

33.     During the Zoom meetings, MCDONALD conveyed a high sense of urgency and suggested that K.F.'s family members would lose the opportunity to invest if they did not do so quickly. MCDONALD stated that the "sense of urgency is that there will no longer be equity available to you all if we don't close the transaction, because we have other pending transactions," and that the "drop dead date to make an investment" was "last Friday." MCDONALD also told K.F.'s family members that he had "a loophole and a window to let another transaction occur." K.F.'s family members and friends ultimately agreed to pool their money and make a $1 million investment in HERCULES via an entity with the initials T.I. In exchange for T.I.'s $1 million investment, T.I. was to receive "units" in HERCULES.

34.     HERCULES' email records show that on or about March 9, 2021, MCDONALD asked T.I.'s managing member, R.F., to make a partial payment toward the purchase of T.I.'s equity share in HERCULES. MCDONALD stated in an email to R.F.:

> We have commenced with execution of other parties['] equity ownership transfer and have held your equity allocation in reserve status, thereby precluding other interested groups from moving forward at the agreed valuation.
>
> Immediate receipt of funds from your group even if partial will facilitate a good faith understanding that all parties have full intent of execution.

35.     R.F. agreed, and T.I. wired approximately $675,000 to HERCULES. R.F. initiated the wire transfer in North Carolina, where R.F. was located, and directed the wire transfer to HERCULES in Los Angeles, California. The $675,000 wire transfer was deposited into HERCULES' bank account in Los Angeles on March 9, 2021. The day before, HERCULES' account held only $3,147.64.

36.     In addition to agreeing to invest in HERCULES as a member of T.I., K.F. also agreed to invest in HERCULES in his individual capacity. A unit purchase agreement between MCDONALD and K.F. shows that on or about March 3, 2021, K.F. agreed to invest $1 million in HERCULES in exchange for 20 units in the company. K.F. also agreed to provide unspecified services in exchange for an additional 30 units in HERCULES.

     a.     While T.I. did not execute a unit purchase agreement with HERCULES, K.F.'s unit purchase agreement specified that "[u]pon the purchase and sale of the Units, the Purchaser shall be a member of the Company." This equity arrangement is consistent with the understanding of R.F. and K.F. as to the nature of T.I.'s investment in HERCULES' capital raise, and the definition makes clear that the "units" MCDONALD was selling constituted "securities" within the meaning of the Securities Exchange Act of 1934.[11]

37.     K.F. has informed me that MCDONALD did not disclose to him prior to his investment in HERCULES that HERCULES' clients had recently suffered extensive losses as a result of bad stock trades. Had K.F. known about these losses, he would not have invested any money with MCDONALD or HERCULES.

38.     The source of the funds for K.F.'s investment was supposed to be K.F.'s individual retirement account ("IRA"). Although K.F. attempted to send MCDONALD/HERCULES the agreed-upon $1 million investment, the administrators of K.F.'s IRA would not permit the requested funds transfer. Accordingly, the investment agreement between K.F. and HERCULES was never fully executed.

### D.    MCDONALD Misappropriates T.I.'s Funds

39.     Bank records and records from HERCULES show that on March 9, 2021, the day that T.I. made the $675,000 payment to HERCULES, approximately $10,000 was wired out of

---

[11] The statute broadly defines a "security" to include "any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 15 U.S.C. § 78c(10).

HERCULES' bank account and into MCDONALD's personal bank account and $10,000 was paid to MCDONALD's credit card, which he had used to pay a $10,000 deposit on a Porsche approximately two days prior.

40.     On March 10, 2021, approximately $174,610 was transferred out of HERCULES' bank account to pay off the balance of the Porsche MCDONALD had recently purchased; approximately $109,512 was transferred to the landlord of a home MCDONALD was renting in Arcadia, California; and approximately $6,800 was spent on the website cosiani.com, which sells designer menswear.

41.     The following day, on or about March 11, 2021, approximately $50,000 was transferred to a HERCULES client to repay the client's losses and approximately $85,000 was transferred to MCDONALD's personal checking account. The $85,000 transfer to MCDONALD's personal checking account appears to have ultimately been used to pay a client of ISA, even though, as noted above, ISA had not been registered as an investment-adviser since May 2019.

**E.     K.F. Learns About HERCULES' Financial Problems and K.F. and R.F. Confront MCDONALD in a Recorded Call**

42.     According to K.F., on or about March 10, 2021—one day after R.F. wired T.I.'s partial payment towards its investment in HERCULES—K.F. received a text message from HERCULES employee K.S. requesting a phone call. K.F. had met K.S. during a visit to MCDONALD's home. During the call, K.S. told K.F. that MCDONALD had placed a trade in October 2020 that had moved against MCDONALD and put him in a very financially stressed situation, and K.S. warned K.F. that MCDONALD was using the capital raise to pay clients that had been affected by the bad trade so that the clients would not file complaints against him. K.S. advised K.F. not to invest in HERCULES. When K.F. told K.S. that K.F.'s family had already invested money, K.S. advised K.F. to call MCDONALD and tell him to send the money back. K.S. also told K.F. that K.S. had not yet been paid any of his salary that year, and MCDONALD had failed to pay K.S. on two occasions the prior year.

43.     According to K.F., K.F. called MCDONALD the next morning and told MCDONALD that K.F. had received a disturbing call that had caused K.F. to question the state and intent of the business. K.F. requested that MCDONALD return K.F.'s family's money. MCDONALD initially responded that he was blindsided by the request and asked about his accuser. It then quickly became clear to K.F. that MCDONALD no longer had all the money T.I. sent him. When K.F. said he did not understand where the money had gone in a day, MCDONALD responded that he had a lot of expenses, such as payroll.

44.     After K.F.'s call with MCDONALD, K.F., R.F., and another investor participated in a recorded Zoom meeting with MCDONALD. I know from reviewing the recording that during this meeting, R.F. told MCDONALD that when MCDONALD asked R.F. to send a good-faith deposit to hold T.I.'s equity position, R.F. believed that meant MCDONALD needed the money to show other prospective investors that he already had real investors; R.F. did not understand MCDONALD's request to mean MCDONALD was in a cash crunch and he needed the money from R.F. to fill a financial hole. R.F. noted that they had not even signed any agreements with HERCULES yet and requested that MCDONALD return the money from T.I. as soon as possible.

45.     In response, MCDONALD said that "meaningful capital" had already been spent because MCDONALD had budgeted to spend the money as it came in. MCDONALD said he had a $2.2 million transaction pending, and he could use that money to repay T.I. if that deal went through.

46.     When R.F. commented that MCDONALD apparently was not going to address "the ethics of it all," MCDONALD responded that he never said the partial payment T.I. made was going to be held in escrow; rather, he said the investment was a purchase of equity. MCDONALD further stated that he never said he was not going to use the money.

47.     Following this meeting, MCDONALD emailed R.F. a promissory note promising to return T.I.'s $675,000 partial investment payment. MCDONALD said in his email it was his "full intent and desire to return your capital immediately from an equity investment transaction

expected to materialize within the next two business days"; if, however, the transaction did not transpire, MCDONALD said he would return the capital from "future equity investment transactions, asset sales, revenue and[/]or financing." MCDONALD also noted in his email that R.F. had asked MCDONALD to memorialize their conversation and had asked MCDONALD to acknowledge in writing the following:

> My spending of the capital investment made by you was a breach of a 'good faith' expectation to hold your equity and the capital until a written agreement was executed.

> You were not aware of Hercules Investments['] weak financial condition and had you been aware you may have elected to not make the investment.

48.    Bank records show that MCDONALD repaid a portion of T.I.'s investment in a series of payments over the course of several months in 2021. Specifically, in total, MCDONALD repaid approximately $106,455 to T.I. of its $675,000 investment.

49.    According to R.F., MCDONALD has never fully repaid T.I. for its investment.

50.    R.F. reiterated in an interview that he never would have caused T.I. to invest in HERCULES had he known of HERCULES' weak financial condition, including the massive losses suffered by HERCULES' clients and HERCULES and MCDONALD's obligations to repay those losses. R.F. further stated he would not have transferred $675,000 to HERCULES' bank account on March 9, 2021, had R.F. known that money was going to be immediately spent or if he had known it would fund MCDONALD's personal expenses.

**F.    Meanwhile, MCDONALD Continues Using ISA to Conduct Business, Even Though ISA Is No Longer Registered as an Investment Adviser, and He Sends ISA Clients False Account Statements**

51.    While operating HERCULES, MCDONALD also continued to cause his other investment-adviser firm, ISA, to continue acting as an investment adviser, even though MCDONALD had withdrawn ISA as a state-registered investment adviser firm.

52.    For example, documents provided by C.M.[12] show that on or about November 14, 2019—approximately six months after MCDONALD had withdrawn ISA as a state-registered investment-adviser firm—MCDONALD, on behalf of ISA, entered into a performance fee investment advisory contract with C.M. and C.M.'s wife.

   a.    The contract listed ISA's Central Registration Depository number, which is a unique identifier that the Financial Industry Regulatory Authority ("FINRA") assigns to all registered brokers and brokerage firms. This number can be used by the public to search an online database containing detailed information about both individual brokers and financial firms. A search of the number listed on the contract would have revealed that ISA was not registered as an investment adviser with the SEC or any state.

53.    The contract stated that the custodian for the execution of securities transactions would be Interactive Brokers and that the client—i.e., C.M. and his wife—had or would open(ed) an account with Interactive Brokers.

54.    According to C.M., at some point before C.M. gave MCDONALD any money to invest, MCDONALD provided C.M. with two forms: one showing that MCDONALD had applied to register HERCULES as an investment adviser on April 7, 2021, and one showing that MCDONALD had applied to register ISA as an investment adviser on January 3, 2017. MCDONALD did not disclose, however, that ISA's registration as an investment adviser had been terminated, and ISA was not registered as an investment adviser with the SEC or any state as of May 1, 2019.

55.    C.M. told me during an interview that after signing the contract, he made an initial investment of $40,000. He provided this initial investment to MCDONALD in cash at a HERCULES launch event in downtown Los Angeles. C.M. said he was not aware that ISA's registration as an investment adviser had been terminated prior to C.M. investing, and he stated that he would not have made the investment had he known.

---

[12] Witness D.J. has alleged that MCDONALD helped C.M. get a fraudulent Paycheck Protection Program loan. At this point, I have no further information to support this allegation.

56.     After making the initial investment, C.M. began receiving account statements from ISA. When C.M. asked MCDONALD why the statements were being sent on behalf of ISA, rather than HERCULES, MCDONALD told C.M. that he had separate funds for friends, where investments were held at Interactive Brokers.

57.     After the initial $40,000 investment, C.M. and his wife made additional investments with MCDONALD. C.M. estimated that, in total, he and his wife invested approximately $351,000.

58.     At some point after C.M. and his wife had sent funds to MCDONALD, a former HERCULES employee contacted C.M. and told C.M. he should ask MCDONALD where C.M.'s money was. C.M. approached MCDONALD and told MCDONALD that C.M. and his wife needed their money for a down payment on a home. In response, MCDONALD told C.M. that MCDONALD had lost a lot of money investing in the market. MCDONALD further said that C.M. had lost a lot of money as a result, though there was a chance MCDONALD could get some of the money back. C.M. never got his full investment back.

59.     C.M. sent me the ISA account statements that MCDONALD sent to C.M. and his wife. The earliest account statement is from December 2019 and the latest account statement is from January 2021. The statements purport to show an account overview with information such as the cumulative return on investment, the monthly starting and ending net asset value, and the ending asset allocation. For instance, the January 2021 account statement purportedly shows that C.M.'s account had a beginning net asset value of $380,246 and an ending net asset value of $408,003. The account statement further purports to show that the $408,003 was held entirely in cash and none of that money was held in stocks or options.

60.     As noted above, the contract between MCDONALD and C.M. states that the custodian for C.M. and his wife's investment funds would be Interactive Brokers. Records from Interactive Brokers show, however, that Interactive Brokers has no record of C.M. having an account there.

61.     As discussed in greater detail below, before going into hiding, MCDONALD provided a witness with a thumb drive that MCDONALD said contained all the information necessary to figure out to whom MCODNALD owed money. The thumb drive contained, among other things, several documents in PowerPoint format that purport to be account statements for several ISA investment-adviser clients, including C.M. and his wife. Because the statements are in PowerPoint format, they can easily be manipulated by the user. The ISA statements sent to C.M., however, were in PDF format.

62.     Based on the format of the ISA statements on the thumb drive, the fact that Interactive Brokers has no record of C.M. having an individual brokerage account there, and my training and experience, I believe that the statements MCDONALD sent to C.M. and his wife had been falsified to make it appear their funds were being held in a separate account and successfully invested.

### G.     MCDONALD Goes Into Hiding After Failing to Appear for an SEC Deposition and Admitting to a Witness That He Took Investor's Money and Did Not Invest It

63.     I know the following from reviewing a deposition transcript produced by the SEC:

a.      On or about October 1, 2021, an attorney for the SEC asked the attorney representing MCDONALD, HERCULES, and ISA to provide dates for MCDONALD to testify before the SEC. MCDONALD's counsel and the SEC attorney agreed to October 14, 2021. Two days before that date, MCDONALD's counsel emailed the SEC attorney to inform the latter that MCDONALD, HERCULES, and ISA would be retaining new counsel, that the October 14 date was no longer practicable, and that new counsel would reach out to the SEC attorney "at the first opportunity."

b.      Because no counsel for MCDONALD did reach out to the SEC attorney, on or about October 26, 2021, he emailed MCDONALD two subpoenas: (1) a subpoena to appear for testimony on November 16, 2021, and (2) a subpoena directed to HERCULES for the production of documents by November 9, 2021. The SEC attorney sent the email with both

subpoenas to MCDONALD's email address at HERCULES and to MCDONALD's personal email address. The SEC attorney further caused the subpoenas to be served on MCDONALD by UPS at MCDONALD's residence and to the HERCULES office. UPS tracking information showed that the subpoenas were delivered.

c.      On November 9, 2021, MCDONALD, using his HERCULES email address, emailed the SEC attorney documents called for by the subpoena for documents directed to HERCULES.

d.      A few days later, the SEC attorney responded to MCDONALD's email and reminded MCDONALD that he had been subpoenaed to testify in the SEC's investigation on November 16, 2021. The SEC attorney asked MCDONALD to advise whether he was represented by counsel and, if so, to provide counsel's contact information as soon as possible. MCDONALD did not respond.

e.      The SEC attorney was advised by the SEC's process server that on November 13, 2021, MCDONALD was personally served with the SEC's subpoenas.

f.      On November 15, 2021, the SEC attorney emailed MCDONALD the details for joining the WebEx for his testimony. The SEC attorney informed MCDONALD that he was required to appear and if he failed to do so, the SEC would make a record of MCDONALD's non-appearance and would evaluate seeking a federal court order compelling his appearance. MCDONALD did not respond.

g.      On the day of MCDONALD's subpoenaed testimony, MCDONALD failed to appear. The SEC attorney tried calling the HERCULES office main phone number but got a persistent busy signal. The attorney also tried calling MCDONALD's cellphone number but got a message saying the mailbox was full and could not accept any messages.

64.      According to MCDONALD's former romantic partner and business associate, D.J., after the SEC subpoenaed records from HERCULES and subpoenaed MCDONALD for testimony, MCDONALD told D.J. that he was not going to stick around and that he would "vanish." D.J. also told me the following:

20

    a.     In October 2021, MCDONALD gave D.J. a laptop and a cell phone and said D.J. could use the devices to communicate with MCDONALD undetected. MCDONALD also gave D.J. a thumb drive, which, according to MCDONALD, contained all the information necessary to figure out to whom MCDONALD owed money.[13]

    b.     D.J. woke up one morning around the end of October 2021 or early November 2021 and noticed that MCDONALD left his car, with the car keys inside, in her driveway. MCDONALD had not been back to D.J.'s house since that time.

    c.     Additionally, D.J. began receiving mail addressed to MCDONALD at her home address.

    d.     The last communication D.J. had with MCDONALD was a phone call on or about November 18, 2021. During the call, MCDONALD confessed to D.J. that he took his investors' money but did not invest it.

65.    During my interview with D.J., D.J. provided me with MCDONALD's primary phone number and email address. Subscriber information from the service providers show that the accounts associated with MCDONALD's primary phone number and primary email address have been cancelled or terminated.

66.    Based on my training and experience, MCDONALD's failure to appear at the SEC deposition; his statements to D.J.; and the fact that he abandoned his car, cancelled his phone and email accounts, and had his mail forwarded demonstrate that he is intentionally concealing his whereabouts.

//

//

---

[13] D.J. voluntarily provided me with these devices, and I obtained a federal warrant to search each of them. *See In the Matter of the Search of the Digital Devices Described in Attachment A-1*, Case No. 2:22-MJ-00448 (C.D. Cal. Feb. 3, 2022). The thumb drive contained, among other things, the false ISA statements described above.

## **CONCLUSION**

67.    For all of the reasons described above, there is probable cause to believe that

MCDONALD has committed Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and

17 C.F.R. 240.10b-5.

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by
telephone on this  21st day of September, 2022.

_____
UNITED STATES MAGISTRATE JUDGE
ALEXANDER F. MacKINNON

```
1   E. MARTIN ESTRADA
    United States Attorney
2   SCOTT M. GARRINGER
    Assistant United States Attorney
3   Chief, Criminal Division
    ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
4   CAROLYN S. SMALL (Cal. Bar No. 304938)
    Assistant United States Attorneys
5   Major Frauds Section
         1100 United States Courthouse
6        312 North Spring Street
         Los Angeles, California 90012
7        Telephone: (213) 894-1259/2041
         Facsimile: (213) 894-0141
8        E-mail:    alexander.schwab@usdoj.gov
                    carolyn.small@usdoj.gov
9
    Attorneys for Plaintiff
10  UNITED STATES OF AMERICA
```

**LODGED**
CLERK, U.S. DISTRICT COURT

9/21/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ cd ___ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

9/21/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ ib ___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.    2:22-mj-03751-DUTY |
|         Plaintiff, | GOVERNMENT'S NOTICE OF REQUEST FOR DETENTION |
|         v. | |
| JAMES ARTHUR MCDONALD, JR., | |
|         Defendant. | |

     Plaintiff, United States of America, by and through its counsel of record, hereby requests detention of defendant and gives notice of the following material factors:

☐  1.    Temporary 10-day Detention Requested (§ 3142(d)) on the

          following grounds:

   ☐  a.    present offense committed while defendant was on release

             pending (felony trial),

   ☐  b.    defendant is an alien not lawfully admitted for

             permanent residence; and

1

2  ☐ c.    defendant may flee; or

3  ☐ d.    pose a danger to another or the community.

4  ☒ 2.    Pretrial Detention Requested (§ 3142(e)) because no

5          condition or combination of conditions will reasonably

6          assure:

7  ☒ a.    the appearance of the defendant as required;

8  ☒ b.    safety of any other person and the community.

9  ☐ 3.    Detention Requested Pending Supervised Release/Probation

10         Revocation Hearing (Rules 32.1(a)(6), 46(d), and 18 U.S.C.

11         § 3143(a)):

12 ☐ a.    defendant cannot establish by clear and convincing

13         evidence that he/she will not pose a danger to any

14         other person or to the community;

15 ☐ b.    defendant cannot establish by clear and convincing

16         evidence that he/she will not flee.

17 ☐ 4.    Presumptions Applicable to Pretrial Detention (18 U.S.C.

18         § 3142(e)):

19 ☐ a.    Title 21 or Maritime Drug Law Enforcement Act ("MDLEA")

20         (46 U.S.C. App. 1901 et seq.) offense with 10-year or

21         greater maximum penalty (presumption of danger to

22         community and flight risk);

23 ☐ b.    offense under 18 U.S.C. §§ 924(c), 956(a), 2332b, or

24         2332b(g)(5)(B) with 10-year or greater maximum penalty

25         (presumption of danger to community and flight risk);

26 ☐ c.    offense involving a minor victim under 18 U.S.C.

27         §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251,

28

2251A, 2252(a)(1)-(a)(3), 2252A(a)(1)-2252A(a)(4), 2260, 2421, 2422, 2423 or 2425 (presumption of danger to community and flight risk);

☐ d. defendant currently charged with an offense described in paragraph 5a - 5e below, AND defendant was previously convicted of an offense described in paragraph 5a - 5e below (whether Federal or State/local), AND that previous offense was committed while defendant was on release pending trial, AND the current offense was committed within five years of conviction or release from prison on the above-described previous conviction (presumption of danger to community).

☒ 5. Government Is Entitled to Detention Hearing Under § 3142(f) If the Case Involves:

☐ a. a crime of violence (as defined in 18 U.S.C. § 3156(a)(4)), a violation of 18 U.S.C. § 1591, or Federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)(B)) for which maximum sentence is 10 years' imprisonment or more;

☐ b. an offense for which maximum sentence is life imprisonment or death;

☐ c. Title 21 or MDLEA offense for which maximum sentence is 10 years' imprisonment or more;

☐ d. any felony if defendant has two or more convictions for a crime set forth in a-c above or for an offense under state or local law that would qualify under a, b, or c

1    if federal jurisdiction were present, or a combination

2    or such offenses;

3  ☐  e.   any felony not otherwise a crime of violence that

4    involves a minor victim or the possession or use of a

5    firearm or destructive device (as defined in 18 U.S.C.

6    § 921), or any other dangerous weapon, or involves a

7    failure to register under 18 U.S.C. § 2250;

8  ☒  f.   serious risk defendant will flee;

9  ☐  g.   serious risk defendant will (obstruct or attempt to

10    obstruct justice) or (threaten, injure, or intimidate

11    prospective witness or juror, or attempt to do so).

12  ☐  6.  Government requests continuance of _____ days for detention

13    hearing under § 3142(f) and based upon the following

14    reason(s):

15

16    _____

17    _____

18    _____

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

4

1 ☐ 7.  Good cause for continuance in excess of three days exists in

2 that:

3

4 _____

5 _____

6 _____

7 _____

8 Dated: September 21, 2022          Respectfully submitted,

9                                    E. MARTIN ESTRADA
                                    United States Attorney
10
                                    SCOTT M. GARRINGER
11                                   Assistant United States Attorney
                                    Chief, Criminal Division
12

13

14                                   ALEXANDER B. SCHWAB
                                    Assistant United States Attorney
15
                                    Attorneys for Plaintiff
16                                   UNITED STATES OF AMERICA

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CASE SUMMARY

[ Reset Form ]

Case Number: 2:23-cr-00019-DSF

U.S.A. v. James Arthur McDonald, Jr.

[✓] Indictment    [ ] Information

Defendant Number: 1

Year of Birth: 1971

Investigative agency (FBI, DEA, etc.): FBI, IRS-CI

**FILED**
CLERK, U.S. DISTRICT COURT
1/17/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: VAV DEPUTY

**NOTE: All items MUST be completed. If you do not know the answer or a question is not applicable to your case, enter "N/A."**

## OFFENSE/VENUE

a. Offense charged as a:

[ ] Class A Misdemeanor   [ ] Minor Offense   [ ] Petty Offense

[ ] Class B Misdemeanor   [ ] Class C Misdemeanor   [✓] Felony

b. Date of Offense   Continuing to December 13, 2022

c. County in which first offense occurred

Los Angeles

d. The crimes charged are alleged to have been committed in (CHECK **ALL** THAT APPLY):

[✓] Los Angeles    [ ] Ventura

[ ] Orange    [ ] Santa Barbara

[ ] Riverside    [ ] San Luis Obispo

[ ] San Bernardino    [ ] Other _____

Citation of Offense   18 U.S.C. §§ 1343, 1957

15 U.S.C. §§ 78j(b), 78ff, 80b-6, 80b-17; 17 C.F.R. § 240.10b-5;

e. Division in which the MAJORITY of events, acts, or omissions giving rise to the crime or crimes charged occurred:

[✓] Western (Los Angeles, San Luis Obispo, Santa Barbara, Ventura)

[ ] Eastern (Riverside and San Bernardino)   [ ] Southern (Orange)

## RELATED CASE

Has an indictment or information involving this defendant and the same transaction or series of transactions been previously filed and dismissed before trial?

[✓] No    [ ] Yes

If "Yes," Case Number: _____

Pursuant to General Order 21-01, criminal cases may be related if a previously filed indictment or information and the present case:

   a. arise out of the same conspiracy, common scheme, transaction, series of transactions or events; or

   b. involve one or more defendants in common, and would entail substantial duplication of labor in pretrial, trial or sentencing proceedings if heard by different judges.

Related case(s), if any (**MUST MATCH NOTICE OF RELATED CASE**): _____

## PREVIOUSLY FILED COMPLAINT/CVB CITATION

A complaint/CVB citation was previously filed on: 9/21/2022

Case Number: 22-mj-3751

Assigned Judge: Hon. Alexander F. MacKinnon

Charging: 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5;

The complaint/CVB citation:

   [✓] is still pending

   [ ] was dismissed on: _____

## PREVIOUS COUNSEL

Was defendant previously represented?   [✓] No   [ ] Yes

IF YES, provide Name: _____

   Phone Number: _____

## COMPLEX CASE

Are there 8 or more defendants in the Indictment/Information?

   [ ] Yes*   [✓] No

Will more than 12 days be required to present government's evidence in the case-in-chief?

   [ ] Yes*   [✓] No

*AN ORIGINAL AND 1 COPY (UNLESS ELECTRONICALLY FILED) OF THE NOTICE OF COMPLEX CASE MUST BE FILED AT THE TIME THE INDICTMENT IS FILED IF EITHER "YES" BOX IS CHECKED.

## SUPERSEDING INDICTMENT/INFORMATION

**IS THIS A NEW DEFENDANT?**   [ ] Yes   [ ] No

This is the _____ superseding charge (i.e., 1st, 2nd).

The superseding case was previously filed on:

_____

Case Number _____

The superseded case:

[ ] is still pending before Judge/Magistrate Judge

_____

[ ] was previously dismissed on _____

Are there 8 or more defendants in the superseding case?

   [ ] Yes*   [ ] No

Will more than 12 days be required to present government's evidence in the case-in-chief?

   [ ] Yes*   [ ] No

Was a Notice of Complex Case filed on the Indictment or Information?

   [ ] Yes   [ ] No

*AN ORIGINAL AND 1 COPY OF THE NOTICE OF COMPLEX CASE MUST BE FILED AT THE TIME THE SUPERSEDING INDICTMENT IS FILED IF EITHER "YES" BOX IS CHECKED.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CASE SUMMARY

### INTERPRETER

Is an interpreter required?  ☐ YES  ☑ NO

IF YES, list language and/or dialect:

### OTHER

☑ Male  ☐ Female

☑ U.S. Citizen  ☐ Alien

Alias Name(s)

This defendant is charged in:
  ☑ All counts
  ☐ Only counts:

☐ This defendant is designated as "High Risk" per
   18 USC § 3146(a)(2) by the U.S. Attorney.

☐ This defendant is designated as "Special Case" per
   18 USC § 3166(b)(7).

Is defendant a juvenile?  ☐ Yes  ☑ No

IF YES, should matter be sealed?  ☐ Yes  ☐ No

The area(s) of substantive law that will be involved in this case include(s):

☐ financial institution fraud   ☐ public corruption

☐ government fraud              ☐ tax offenses

☐ environmental issues          ☐ mail/wire fraud

☐ narcotics offenses            ☐ immigration offenses

☐ violent crimes/firearms       ☐ corporate fraud

☑ Other  securities fraud, money laundering

### CUSTODY STATUS

Defendant is **not in custody**:
  a. Date and time of arrest on complaint:
  b. Posted bond at complaint level on:
     in the amount of $
  c. PSA supervision?  ☐ Yes  ☐ No
  d. Is on bail or release from another district:

Defendant is **in custody**:
  a. Place of incarceration:  ☐ State  ☐ Federal
  b. Name of Institution:
  c. If Federal, U.S. Marshals Service Registration Number:

  d. ☐ Solely on this charge. Date and time of arrest:

  e. On another conviction:  ☐ Yes  ☐ No
     IF YES :  ☐ State  ☐ Federal  ☐ Writ of Issue
  f. Awaiting trial on other charges:  ☐ Yes  ☐ No
     IF YES :  ☐ State  ☐ Federal   AND
  Name of Court:
  Date transferred to federal custody:

This person/proceeding is transferred from another district pursuant to F.R.Cr.P.  _____ 20  _____ 21  _____ 40

### EXCLUDABLE TIME

Determinations as to excludable time prior to filing indictment/information.  EXPLAIN:

Date   01/17/2023

*Alexander B. Schwab*
Signature of Assistant U.S. Attorney
Alexander B. Schwab
Print Name



**FILED**
CLERK, U.S. DISTRICT COURT
1/17/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____VAV_____ DEPUTY

2:23-cr-00019-DSF



# *Memorandum*

| Subject: | Date: |
|---|---|
| United States v.<br>JAMES ARTHUR MCDONALD, JR. | January 13, 2023 |

| To: | From: |
|---|---|
| KIRY K. GRAY<br>Clerk, United States District Court<br>Central District of California | ALEXANDER B. SCHWAB<br>Assistant United States Attorney<br>Criminal Division |

The above-referenced matter, being filed on January 17, 2023:

- Relates to a matter in which Assistant United States Attorney Carolyn S. Small is or has been personally involved while employed in the USAO and should therefore not be assigned to the Honorable Stanley Blumenfeld Jr.

ALEXANDER B. SCHWAB
Assistant United States Attorney

Name and address:
E. MARTIN ESTRADA, United States Attorney
MACK E. JENKINS, Chief, Criminal Division
CAROLYN S. SMALL, Assistant U.S. Attorney (SBN 304938)
United States Courthouse
312 North Spring Street
Los Angeles, California 90012
(213) 894-2041 / facsimile: (213) 894-6269
carolyn.small@usdoj.gov

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| United States of America, | CASE NUMBER: |
|---|---|
| PLAINTIFF(S) | 2:23-CR-00019-DFS |
| v. | |
| James Arthur McDonald, Jr., | **NOTICE OF APPEARANCE OR WITHDRAWAL OF COUNSEL** |
| DEFENDANT(S) | |

## INSTRUCTIONS

*Appearance of Counsel*:

Attorneys may use this form to enter an appearance in a case, or to update the docket of a case to reflect a prior appearance. To do so, complete Sections I, II, and IV of this form, then file and serve the form in the case. (Using an attorney's CM/ECF login and password to file this form will expedite the addition of that attorney to the docket as counsel of record.)

*Withdrawal of Counsel*:

This form may be used to terminate an attorney's status as counsel of record for a party in three situations: (1) the attorney being terminated has already been relieved by the Court, but the docket does not yet reflect that fact; (2) at least one member of the attorney's firm or agency will continue to represent that party and the withdrawing attorney is not the only member of the Bar of this Court representing that party; or (3) the represented party has been dismissed from the case, but the attorneys are still receiving notices of electronic filing. For any of these situations, complete Sections I, III, and IV of this form, then file and serve the form in the case.

**_Note:_** *In situations not covered above, attorneys seeking to withdraw from a case must first obtain permission from the Court. In such circumstances, attorneys should complete and file a "Request for Approval of Substitution or Withdrawal of Counsel (Form G-01) rather than this "Notice of Appearance or Withdrawal of Counsel" (Form G-123). See Form G-01 for further information.*

## SECTION I - IDENTIFYING INFORMATION

*Please complete the following information for the attorney you wish to add or remove (if removing an attorney, provide the information as it <u>currently</u> appears on the docket; if appearing pro hac vice, enter "PHV" in the field for "CA Bar Number"):*

Name: Carolyn S. Small                                      CA Bar Number: 304938

Firm or agency: United States Attorney's Office

Address: 312 North Spring Street, Suite 1100, Los Angeles, California 90012

Telephone Number: (213) 894-2041          Fax Number: (213) 894-6269

Email: carolyn.small@usdoj.gov

Counsel of record for the following party or parties: United States of America

## SECTION II - TO ADD AN ATTORNEY TO THE DOCKET

*Please select one of the following options:*

☐ The attorney listed above has already appeared as counsel of record in this case and should have been added to the docket. The date of the attorney's first appearance in this case: _____ .

☒ The filing of this form constitutes the first appearance in this case of the attorney listed above. Other members of this attorney's firm or agency have previously appeared in the case.

☐ The filing of this form constitutes the first appearance in this case of the attorney listed above. No other members of this attorney's firm or agency have previously appeared in the case.

☐ By order of the court dated _____ in case number _____ (see attached copy), the attorney listed above may appear in this case without applying for admission to practice *pro hac vice*.

☐ This case was transferred to this district by the Judicial Panel on Multidistrict Litigation ("JPML") pursuant to 28 U.S.C. § 1407 from the _____ District of _____, where it was assigned case number _____. The attorney listed above is counsel of record in this case in the transferee district, and is permitted by the rules of the JPML to continue to represent his or her client in this district without applying for admission to practice *pro hac vice* and without the appointment of local counsel.

☐ On _____, the attorney listed above was granted permission to appear in this case *pro hac vice* before the Bankruptcy Court, and L.Bankr.R. 8 authorizes the continuation of that representation in this case before the District Court.

*In addition, if this is a criminal case, please check the applicable box below. The attorney listed above is:*

☒ USAO   ☐ FPDO   ☐ CJA Appointment   ☐ Pro Bono   ☐ Retained

## SECTION III - TO REMOVE AN ATTORNEY FROM THE DOCKET

***Notices of Electronic Filing will be terminated***. *Please select one of the following options:*

☐ The attorney named above has already been relieved by the Court as counsel of record in this case and should have been removed from the docket. Date of the order relieving this attorney: _____ .

☐ Please remove the attorney named above from the docket of this case; at least one member of the firm or agency named above, and at least one member of the Bar of this Court, will continue to serve as counsel of record for the party or parties indicated.
*(Note: if you are removing yourself from the docket of this case as a result of separating from a firm or agency, you should consult Local Rules 5-4.8.1 and 83-2.4 and Form G-06 ("Notice of Change of Attorney Business or Contact Information"), concerning your obligations to notify the Clerk and parties of changes in your business or contact information.)*

☐ The represented party has been dismissed from the case, but the attorneys are still receiving notices of electronic filing. Date party was dismissed: _____ .

☐ The attorney named above was appointed on appeal and the appeal has been adjudicated. Date the mandate was filed: _____ .

## SECTION IV - SIGNATURE

I request that the Clerk update the docket as indicated above.

Date: June 2, 2023 _____

Signature: /s/ Carolyn S. Small _____

Name: Carolyn S. Small _____